**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Cruz Johnson,

                      Plaintiff,          Civ. No. 14-3210 (RHK/FLN)

v.                                                  **MEMORANDUM OPINION**
                                                       **AND ORDER**

Collecto, Inc., d/b/a EOS CCA, *et al.*,

                      Defendants.

---

Thomas J. Lyons, Jr., Consumer Justice Center, P.A., Vadnais Heights, Minnesota, for Plaintiff.

Michael S. Poncin, James R. Bedell, Issa K. Moe, Moss & Barnett, PA, Minneapolis, Minnesota, for Defendant Collecto, Inc., d/b/a EOS CCA.

---

## INTRODUCTION

Plaintiff Cruz Johnson alleges in this action that Defendant Collecto, Inc., d/b/a EOS CCA ("EOS") violated the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681 *et seq.*, by failing to conduct a reasonable investigation after he disputed a debt EOS reported to a credit-reporting agency. Presently before the Court is EOS's Motion for Summary Judgment. For the reasons that follow, the Motion will be denied.

## BACKGROUND

The relevant facts are undisputed. At some point prior to November 2011, Johnson obtained a computer modem from AT&T. When he attempted to use it, he discovered it could not obtain a proper signal and he promptly returned it. Nevertheless, AT&T billed Johnson and, eventually, turned his account over to EOS for collection.

In March 2012, Johnson was hoping to purchase a home and contacted a mortgage broker. The broker obtained his credit report and discovered derogatory information from EOS related to the AT&T account. The broker told Johnson this posed a problem and needed to be removed. Johnson contacted AT&T, which informed EOS that the account was deactivated and closed and should be deleted. Nevertheless, the derogatory information remained on Johnson's credit report.

In August 2012, the broker again obtained a copy of Johnson's credit report and found the derogatory information from EOS was still being reported. Accordingly, on September 20, 2012, Johnson sent a letter disputing the account information to four credit-reporting agencies, including Equifax and CSC Credit Services (CSC), which was subsequently acquired by Equifax. The letter noted that the reported information was incorrect, that Johnson had returned the modem to AT&T, and that AT&T had previously advised the account should be deleted.

On December 4, 2012, Equifax sent Johnson's dispute to EOS for verification using an electronic form called an ACDV (an acronym for Automated Credit Dispute Verification). EOS, through a company it controls in India, investigated and determined that Johnson's account should in fact be removed from credit reporting, and it "coded" the account for deletion that same day. Two days later, however, Equifax sent EOS another ACDV related to Johnson's account.[1] EOS alleges that in response to the second ACDV, it once again reviewed Johnson's account, which at that point had been marked

---

[1] The record does not reveal why Equifax sent two ACDVs to EOS, although there is some suggestion it was due to Equifax's acquisition of CSC (meaning Equifax received Johnson's dispute letter twice).

for deletion, and responded to Equifax that the account information was correct – in other words, since it had already marked the account for deletion two days earlier, the information *showing deletion* was accurate. (See First Burns Dep. at 75 ("He did that because the account was deleted. And when he looked up the account, he saw it was deleted so his entry was that the account information is accurate as of the date[,] which is referring to the fact it was already a deleted account.").)[2] But as a result of these mixed signals, the deletion was not communicated to Equifax (see id. ("Q: Where does it say anywhere on this ACDV that the account information is deleted? A: Well, there is nothing on this that states that.")), and hence it did not remove the derogatory information from Johnson's credit report. It is unclear what impact, if any, this had on Johnson's attempt to purchase a home, although he alleged in his Amended Complaint that he was denied credit as a result of the failure to remove the derogatory information from his credit file.

Johnson commenced this action against EOS and Equifax in August 2014; he subsequently stipulated to dismiss his claims against Equifax. The Amended Complaint alleges that EOS failed to conduct a reasonable investigation into his dispute, in violation of the FCRA. It further alleges, among other things, that the "erroneous reporting has caused [Johnson] to suffer emotional distress, despair, anxiety, and loss of sleep." (Am.

---

[2] The exact nature of EOS's response to Equifax is unclear from the record, because two versions thereof have been submitted. In one, which is Exhibit 7 to the Deposition of EOS's corporate representative John Burns, EOS's response indicated "[a]ccount information accurate as of date." (Poncin Decl. Ex. B at COLLECTO-000020.) In the other, which is attached to the Declaration of Equifax employee Latonya Munson, EOS's response was "Verified as Reported." (Lyons Decl. Ex. 3 at EIS-JOHNSON-000020.)

Compl. ¶ 23.) With discovery complete, EOS now moves for summary judgment. Its Motion has been fully briefed and is ripe for disposition.

## STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Ricci v. DeStefano, 557 U.S. 557, 586 (2009). The moving party bears the burden of showing that the material facts in the case are undisputed. Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*); Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Beard v. Banks, 548 U.S 521, 529-30 (2006); Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial. Fed. R. Civ. P. 56(c)(1)(A); Wood v. SatCom Mktg., LLC, 705 F.3d 823, 828 (8th Cir. 2013).

## ANALYSIS

**I.     This action remains live**

The Court begins its analysis with EOS's argument that Johnson's claims are now moot. See, e.g., Ark. AFL-CIO v. FCC, 11 F.3d 1430, 1435 (8th Cir. 1993) (*en banc*) ("Mootness . . . acts as a jurisdictional bar, and must be considered before reaching the merits of the case."). EOS contends it made Johnson an Offer of Judgment under Federal

Rule of Civil Procedure 68 for $2,500, plus reasonable attorneys' fees, which Johnson did not accept. It further contends that Johnson cannot show an entitlement to more than $2,500 in damages. As a result, it argues the Offer of Judgment "satisf[ied] plaintiff's entire claim for relief" and therefore "eliminated the controversy for the parties," rending this case moot. (Def. Mem. at 5.) Putting aside that the Court believes Johnson has proffered sufficient evidence from which a jury could award more than $2,500 in damages,[3] the Court rejects the legal premise behind EOS's argument.

To be sure, some courts have adopted the logic EOS espouses. For example, in Greisz v. Household Bank (Illinois), N.A., the defendant made – and the plaintiff rejected – an offer of judgment that "exceeded the maximum amount of money . . . the plaintiff could conceivably have obtained by going to trial." 176 F.3d 1012, 1014 (7th Cir. 1999). The district court dismissed the case as moot, finding that once the defendant had offered the plaintiff complete relief, a case or controversy within the meaning of Article III no longer existed. The Seventh Circuit affirmed, explaining:

> [T]he maximum damages [the plaintiff] could obtain were $1,000, plus reasonable costs and attorney's fees. By offering her $1,200 plus reasonable costs and attorney's fees, the [defendant] was offering her more than her claim was worth . . . in a pecuniary sense. Such an offer, by giving the plaintiff the equivalent of a default judgment (here it was actually larger by $200 than a default judgment would have been), eliminates a legal dispute upon which federal jurisdiction can be based. You cannot persist in suing after you've won.

Id. at 1015 (citations omitted). Other courts have adopted this logic. See, e.g., Warren v. Sessoms & Rogers, P.A., 676 F.3d 365, 370 (4th Cir. 2012) ("[W]e have found there was

---

[3] EOS's argument is predicated on an assertion that Johnson has not properly supported his emotional-distress claim, but as discussed below (see infra at 11-14), the Court disagrees.

no longer any case or controversy when defendants had offered [plaintiffs] the full amount of damages to which the plaintiff[s] claimed entitlement.") (internal quotation marks and citation omitted); Weiss v. Regal Collections, 385 F.3d 337, 340 (3d Cir. 2004) ("An offer of complete relief will generally moot the plaintiff's claim, as at that point the plaintiff retains no personal interest in the outcome of the litigation.").

But as Johnson correctly notes, recent case law calls into doubt the soundness of this reasoning. In Genesis Healthcare Corp. v. Symczyk, __ U.S. __, 133 S. Ct. 1523 (2013), the Supreme Court was poised to decide whether an unaccepted offer of complete relief moots a plaintiff's claims, but ultimately it resolved the case on different grounds. Id. at 1528-29. Nevertheless, Justice Kagan, writing in dissent for herself and three other justices, opined on the question:

> Th[e] thrice-asserted view [that the defendant's offer mooted the plaintiff's individual claims] is wrong, wrong, and wrong again. We made clear earlier this Term that "[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." Chafin v. Chafin, 568 U.S. __, __, 133 S. Ct. 1017, 1023, 185 L. Ed. 2d 1 (2012) (internal quotation marks omitted). "[A] case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." Ibid. (internal quotation marks omitted). By those measures, an unaccepted offer of judgment cannot moot a case. When a plaintiff rejects such an offer—however good the terms—her interest in the lawsuit remains just what it was before. And so too does the court's ability to grant her relief. An unaccepted settlement offer—like any unaccepted contract offer—is a legal nullity, with no operative effect. As every first-year law student learns, the recipient's rejection of an offer "leaves the matter as if no offer had ever been made." Minneapolis & St. Louis R. Co. v. Columbus Rolling Mill, 119 U.S. 149, 151, 7 S. Ct. 168, 30 L. Ed. 376 (1886). Nothing in Rule 68 alters that basic principle; to the contrary, that rule specifies that "[a]n unaccepted offer is considered withdrawn." Fed. Rule Civ. Proc. 68(b). So assuming the case was live before—because the plaintiff had a stake and the court could grant relief—the litigation carries on, unmooted.

> For this reason, Symczyk's individual claim was alive and well when the District Court dismissed her suit. Recall: Genesis made a settlement offer under Rule 68; Symczyk decided not to accept it; after 10 days [the rule now says 14], it expired and the suit went forward. Symczyk's individual stake in the lawsuit thus remained what it had always been, and ditto the court's capacity to grant her relief. After the offer lapsed, just as before, Symczyk possessed an unsatisfied claim, which the court could redress by awarding her damages. As long as that remained true, Symczyk's claim was not moot, and the District Court could not send her away empty-handed. So a friendly suggestion to the Third Circuit: Rethink your mootness-by-unaccepted-offer theory. And a note to all other courts of appeals: Don't try this at home.

Id. at 1533-34 (Kagan, J., dissenting) (alterations in original). Though Justice Kagan was writing in dissent, several Courts of Appeals have subsequently adopted her reasoning. See, e.g., Tanasi v. New Alliance Bank, 786 F.3d 195, 200 (2d Cir. 2015) ("[A] rejected settlement offer [under Rule 68], by itself, [cannot render] moot[] [a] case.") (alterations in original) (internal quotation marks and citation omitted); Stein v. Buccaneers Ltd. P'ship, 772 F.3d 698, 703 (11th Cir. 2014) ("We agree with the Symczyk dissent."); Diaz v. First Am. Home Buyers Prot. Corp., 732 F.3d 948, 954-55 (9th Cir. 2013) ("We are persuaded that Justice Kagan has articulated the correct approach."). Even the Seventh Circuit, which had previously adopted the contrary view, recently questioned whether its earlier decisions remained good law. Scott v. Westlake Servs., LLC, 740 F.3d 1124, 1126 n.1 (7th Cir. 2014) ("[T]here are reasons to question our approach to the problem.") (citing Justice Kagan's dissent in Symczyk).

As the parties point out, the Eighth Circuit has not yet opined on this question. This Court, however, hears Justice Kagan's message loud and clear: an unaccepted Rule 68 offer simply cannot moot a case. As Justice Kagan noted, this conclusion necessarily

flows from the clear text of Rule 68: "An unaccepted offer is considered withdrawn." Fed. R. Civ. P. 68(b). In other words, an unaccepted offer of judgment leaves the case no different than if no offer had been made in the first place; the status of the case remains unchanged. Thus, this case is as live today, after EOS's offer lapsed, as it was when the offer was communicated, and the action is not moot.

**II.     A genuine issue exists**

EOS next argues that Johnson's claim fails on the merits. The Court disagrees.

### A.     The FCRA generally

Among other reasons, the FCRA was enacted to "ensure fair and accurate credit reporting." Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 52 (2007). The statute sets forth the duties of a creditor providing information to a credit-reporting agency, after a creditor has been notified of a consumer's dispute. 15 U.S.C. § 1681s-2(b). Among other things, the creditor must "conduct an investigation with respect to the disputed information," "review all relevant information provided by the . . . reporting agency," and, where an inaccuracy has been found, either modify the information, delete it, or permanently block its reporting. 15 U.S.C. § 1681s-2(b)(1)(A)-(E). Although the statute does not specify what type of investigation must be conducted, courts have held that creditors must "conduct a *reasonable* investigation of their records to determine whether the disputed information can be verified." Malm v. Household Bank (SB), N.A., Civ. No. 03-4340, 2004 WL 1559370, at *4 (D. Minn. July 7, 2004) (Montgomery, J.) (emphasis added) (internal quotation marks and citation omitted); accord, e.g., Johnson v. MBNA Am. Bank, NA, 357 F.3d 426, 430 (4th Cir. 2004) ("[T]he plain meaning of 'investigation'" in

the FCRA "clearly requires some degree of careful inquiry by creditors. . . . [The statute] requires creditors, after receiving notice of a consumer dispute from a credit reporting agency, to conduct a reasonable investigation of their records to determine whether the disputed information can be verified."); Schaffhausen v. Bank of Am., N.A., 393 F. Supp. 2d 853, 858 (D. Minn. 2005) (Tunheim, J.).

A consumer aggrieved by a creditor's violation of the statute may sue for money damages. If he can show the creditor's *negligence* resulted in a violation, he is entitled to recover his actual damages. 15 U.S.C. § 1681o(a). If, by contrast, he can show the creditor violated the statute *willfully*, he may recover actual damages or statutory damages of between $100 and $1,000, plus punitive damages. § 1681n(a). Nevertheless, the statute does not create strict liability, and an FCRA plaintiff must demonstrate at least negligence by the creditor in order to prevail. See Safeco, 551 U.S. at 53; Hauser v. Equifax, Inc., 602 F.2d 811, 814 (8th Cir. 1979) ("The Act provides for recovery by a consumer upon a showing of willful or negligent failure" to comply with the statute.).

### B. The FCRA applied here

EOS contends that Johnson's claim fails because he cannot show either a willful or negligent violation of the FCRA. The Court need not consider whether EOS's alleged violation was willful, because at a minimum Johnson has created a genuine issue whether EOS was negligent in its investigation and subsequent reporting to Equifax, in violation of the statute.

As noted above, upon receiving the first ACDV from Equifax, EOS undertook an investigation and determined the AT&T account should be deleted from reporting. Had

Equifax been so informed, this lawsuit likely never would have been filed.  But Equifax sent a second ACDV to EOS two days later, and in response EOS "verified" the account "as reported" – which, as EOS knew, had been reported *as delinquent*.  (See Poncin Aff. Ex. F.)  It defies logic for EOS to now claim that it verified the account's *deletion* when its response simply informed Equifax that the account was "Verified *as Reported*." (Lyons Decl. Ex. 3 at EIS-JOHNSON-000020 (emphasis added).)  Indeed, EOS's corporate representative acknowledged in his deposition that nothing in EOS's response to Equifax indicated the account should be deleted.  For these reasons, a jury could conclude that EOS's "convoluted and inconsistent responses to [Equifax's] inquires show that its investigation procedures were unreasonable."  Schaffhausen, 393 F. Supp. 2d at 858; see also Rambarran v. Bank of Am., N.A., 609 F. Supp. 2d 1253, 1261-62 (S.D. Fla. 2009) (noting that an "investigation that yields less-than-perfect results may nevertheless be reasonable given the facts of a particular case," but the question in that instance should be resolved by a jury).

EOS attempts to lay the blame on Equifax, claiming the credit bureau must have "reinserted" the derogatory information into Johnson's credit report after EOS informed Equifax the account should be deleted.  (See Reply Mem. at 5.)  But EOS's corporate representative testified that it sends account information to Equifax only once per week, on Friday.  (Second Burns Dep. at 17-18.)  EOS's initial determination that the account should be deleted was made on December 4, 2012, a Tuesday, while its subsequent determination the account was "Verified as Reported" was made on December 6, 2012, a Thursday.  In other words, EOS's deletion response may never have been transmitted to

Equifax, and even if it were, it would have been sent together with its response indicating "Verified as Reported." Nothing in the record suggests Equifax was told to remove the derogatory information and then "reinserted" it later, as EOS contends.

Viewing the record in the light most favorable to Johnson, a jury question exists as to whether EOS negligently violated the FCRA.

**C. Damages**

Relying on the Eighth Circuit's recent decision in Taylor v. Tenant Tracker, Inc., 710 F.3d 824 (8th Cir. 2013), EOS also argues Johnson must show more than negligence here because he cannot show he has sustained any actual damages. As noted above, an FCRA plaintiff who shows a creditor negligently violated the statute may recover only his actual damages. 15 U.S.C. § 1681o(a). In the absence of such damages, therefore, an FCRA negligence claim fails. See, e.g., Hyde v. Hibernia Nat'l Bank, 861 F.2d 446, 448 (5th Cir. 1988); Morse v. USAA Fed. Sav. Bank, No. 12-CV-381, 2012 WL 6020090, at *3 (D. Nev. Dec. 3, 2012) ("[A]ctual damages . . . are a required element" of a claim for negligent violation of the FCRA). But EOS's argument falters because Johnson has proffered sufficient evidence from which a jury could award him actual damages for emotional distress.

The plaintiff in Taylor applied for housing assistance under the federal program known as "Section 8." She met with a representative of the local housing authority, who informed her that she was required to undergo a background check to obtain assistance. The plaintiff signed a release permitting the authority to perform a background check, and the authority used the defendant (Tenant Tracker) to generate a report that same day

- 11 -

(April 7).  The report incorrectly indicated the plaintiff had been convicted of certain crimes, and the representative read Tenant Tracker's report to the plaintiff, who "started crying and [was] very upset."  Id. at 826.  The representative then went to her supervisor, who noted the identifying information in the report – height, weight, eye color, hair color, and other physical characteristics – did not appear to match the plaintiff.  Accordingly, the housing authority determined "within approximately five to ten minutes" that the background check did not relate to the plaintiff, and it approved her application for Section 8 assistance later that same day.  The authority later sent corrected identifying information to Tenant Tracker, which generated a second report that listed no criminal offenses for the plaintiff and sent it to the authority the following day (April 8).

Nevertheless, the plaintiff sued Tenant Tracker, alleging it had violated the FCRA.  The district court dismissed after finding no violation of the statute; the Eighth Circuit affirmed but on alternative grounds, namely, that the plaintiff had "presented insufficient evidence to show that she suffered 'actual damages' from any violation."  Id. at 827.  The court noted:

> The evidence of alleged emotional injury consists of Taylor's testimony that she "was very upset" and "extremely upset and embarrassed" by the entries in the report concerning other persons named Taylor, and [the housing authority employee's] testimony that Taylor "had started crying and [was] very upset" during their brief meeting.  In our view, this evidence is insufficient to satisfy the requirement of genuine injury and actual damages. . . . Taylor suffered no physical injury and was not medically treated for any psychological or emotional injury.  Taylor offered no reasonable detail about the nature and extent of her alleged emotional distress.  Although [the housing authority employee] witnessed Taylor crying during the meeting, corroboration of a brief episode of frustration and unhappiness does not establish the sort of concrete emotional distress that is required to constitute a genuine injury and actual damages.  We

>therefore conclude that the district court properly dismissed Taylor's claim under the FCRA, albeit for reasons different than those cited in the court's order granting summary judgment.

Id. at 829.  The court recognized that "injury may be established solely by a plaintiff's own testimony," but it emphasized that a plaintiff must provide evidence showing something more than "a brief episode of frustration and unhappiness."  Id. at 828-29.

EOS seizes upon Taylor to argue Johnson has no evidence to substantiate his claims of emotional distress and, hence, cannot show any actual damages.  But the facts here are quite different from Taylor; Johnson has proffered evidence showing much more than a "brief episode of frustration and unhappiness."  Indeed, he avers that he has suffered "despair, anxiety, and loss of sleep" as a result of EOS's "failure to accurately report his credit information" (Pl. Answers to Def. Interrog. ¶ 8; see also Am. Compl. ¶ 23 ("[E]rroneous reporting has caused [Johnson] to suffer emotional distress, despair, anxiety, and loss of sleep.")), and these allegations have been corroborated by his daughter, Shelby Johnson.  Ms. Johnson has submitted a Declaration averring that she resided with her father from December 2012 to May 2013 and observed him "suffer[ing] extreme frustration, anger, and anxiety to the point that he could not sleep based on an AT&T collection item that he could not get removed from his credit report."  (Shelby Johnson Decl. ¶ 6.)  She also avers that she witnessed her father "up late at night complaining that he could not fall asleep due to his preoccupation with the AT&T collection item not being removed from his credit report" and that he experienced wild

mood swings, accompanied by "outbursts with yelling and even fits of crying," because he was "obsessed with the AT&T bill." (Id. ¶¶ 8-12.)[4]

Hence, unlike the plaintiff in Taylor, there is evidence in the record here indicating that Johnson suffered from physical maladies (inability to sleep, anxiety), for something much more than a "brief" period, as a result of EOS's conduct. In the Court's view, therefore, there is sufficient evidence from which a reasonable jury could find actionable emotional distress entitling Johnson to "actual damages" under the FCRA. See also, e.g., Bakker v. McKinnon, 152 F.3d 1007, 1013 (8th Cir. 1998) (upholding award of actual and punitive damages when plaintiffs were unable to demonstrate out-of-pocket damages but "testified about how they felt when appellant obtained their credit reports and violated their privacy, thereby causing them some emotional distress"); Graham v. CSC Credit Servs., Inc., 306 F. Supp. 2d 873, 880 (D. Minn. 2003) (Davis, J.) ("Graham's testimony regarding his frustration, anxiety, and humiliation throughout his ordeal raised a genuine issue of material fact regarding whether he suffered emotional distress damages.").

---

[4] EOS protests that the Court "should refuse to consider" Shelby Johnson's Declaration because (i) Johnson identified his daughter as a witness only late in the discovery period, and after repeated requests, and (ii) she failed to appear at a duly noticed deposition despite having been subpoenaed. (Reply at 7-8.) Yet, EOS sought no relief from the Court for these alleged discovery failings, either through a motion to compel or a motion for sanctions/contempt. See Fed. R. Civ. P. 37. Nor did it seek to postpone the resolution of its summary-judgment Motion until after it could conduct Ms. Johnson's deposition. See Fed. R. Civ. P. 56(d).

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that EOS's Motion for Summary Judgment (Doc. No. 27) is **DENIED**.

Date: September 8, 2015

s/Richard H. Kyle
RICHARD H. KYLE
United States District Judge